May it please the Court, David Urban for Los Angeles Community College District. This case concerns the experience of two blind students at Los Angeles City College. Some findings of liability and an overbroad injunction that covers many aspects, if not most aspects, of the college's operations. The students in question both successfully completed their studies at the City College. One went on to a four-year institution. I'd like to say at the outset this is a complicated case as this Court has probably recognized. There are numerous motions for summary judgment, bench trial, jury trial, and then an injunction that has many different aspects to it. The keys to this case and a way to simplify it are basically that the District Court, among others, committed two very serious errors in terms of interpreting the law. Those are first to interpret the disability laws as prohibiting any conduct by sighted students. Access to resources at the same time were prior to sighted students having access. Let me ask you this. I'm trying to get my arms around the District's position. I know that you get money for students with disabilities, correct? I understand that there is funding for that. Yes, and that's to do so. If I would simplify your the District seems to take some sort of position that they don't really have to do anything until someone comes in and complains. I'm pretty sure that the government expects a little more out of you than that. Can you tell me that just doesn't... I see on some level why you lost in front of a judge and why you lost partially in front of a jury. It's not a very appealing argument in terms of you get this money, you know you're going to have students with disabilities, and then you put all of the onus on the person to come in and complain before you do anything. That's an excellent point, Your Honor. That's not our position that that's the only way to accommodate the students. There can be no intentional discrimination. If there is a resource inaccessible to blind students, there has to be a reasonable modification that allows them to have access. One way to comply with the law would be to just make sure that the capabilities of that particular blind students and blind students generally are met. That would be the easiest way to provide. In some instances, it would be the easiest way to have accessible resources available. If that doesn't work, then reasonable accommodation would come in and remedy the situation for the blind students. Counsel, I thought the record showed that there was a position, a vice president level position that was left unfilled. The responsibility for which was to determine the level of accessibility of all college resources to the disabled. The school, for whatever reason, just left the office vacant, which suggests that the district court was correct, that the college had sort of a devil may care attitude with regard to compliance with disability law. Your Honor, that's certainly not my client's attitude toward students with blindness or disability. The allegation that that position was unfilled, it's not part of the findings of the district court. The district court didn't determine that there was a violation. Is there evidence in the record that that position was timely filled? Because it looked to me like it was vacant for a long period of time. Since that is not one of the issues that the district court found liability on, it's not something that's... If the court determines it to be a dispositive point... Well, it goes to the question that Judge Callahan asked, which is, is this a college that basically didn't do anything until a disabled student asked for help? So it put the onus on the disabled student to sort of be their own advocate when the college had agreed to establish a position that should have been advocating for disabled people. Your Honor, to respond to your question, I'll go back to it. That is not part of the district court's findings of liability. It might be an indication that there should have been something that the question... It's certainly evidence that supports the jury's verdict, isn't it? At least with regard to Mr. Payen. If it supports the jury's verdict, our determination... The jury trial was for damages only. What we're attacking is... Yeah, but damages have to be based on some wrongful behavior by the defendant that injures the plaintiff, don't they? Certainly. Your Honor, let me respond directly to your point. The jury trial was considered a victory for the district because there was only one finding of liability. Just for background, the plaintiff's request... So you're saying it's a victory that... Are you saying that this is a victory that would entitle you to attorney's fees? I don't think so. Your Honor, we consider it... You didn't lose as badly as you thought you could have. I mean, whatever attitude you came in here with... You have a judge. You have a jury. You have two different... You have a bench trial. You have a jury trial. No one really thought that the district did a good job here. Now, there's a lot of intricate legal issues that are involved here, and I tell you that. But I don't... You're not warming my heart here by telling me that the district... The district has a practice of waiting for someone to complain, using that money for whatever they want to use it for. I don't know. Then they come up with the things they come up with are... You don't get things right away. So you're already starting out with, you can't see. So it's kind of probably hard to get into the office. Then you get in the office. You tell them what you need. They don't get it right away. So then you're already behind. You can't participate in class, and hopefully these people... I think that they're probably pretty smart, so they were able to actually get through this. But then there was some homework system that you have to do your homework a certain way in a program, and it wasn't accessible to blind students. So then if you don't do your homework, you don't get credit for your homework, and then you get behind, and it just doesn't look good. Well, the Flanders papers, they made a lot of effort to make us not look good. There are students who are blinded. But it doesn't look good. It didn't look good to the judge. It didn't look good to the jury. Let me respond to your point. For the Court of Appeals' job is to find out whether the district court made any errors. We've demonstrated two very clear errors. No matter how the district... Let's talk about your Daubert hearing part of it.  I was a trial judge. I did a lot of bench trials. And what a Daubert hearing is, is you call the witnesses, you cross-examine them, and you decide as a gatekeeper, are you going to let it in? So how is what really happened here any different in a bench trial? The witnesses were called. They were cross-examination. After the judge heard them, decided, well, I think it's reliable, and allowed it to be in. So you really kind of got a Daubert hearing. If it had been a jury trial, I'm totally with you on that, but I'm hard-pressed to see how you were damaged on that with a bench trial. Well, the court should have... It goes in part to the court crediting the evidence. Our argument is, number one, it shouldn't have been admitted at all. And then if you do look at the lack of credibility for those expert opinions, it would also go to the way. But it would go to... I mean, it's a technical matter. A motion to eliminate a bench trial is perfectly acceptable. Counsel, you've got a problem with that in that your expert on deposition essentially agreed with the conclusions of the two plaintiff's experts, and then tried to back away from it by filing what the district court characterized as a sham declaration, which, as I understand what sham declarations are, it looks like a sham declaration to me. So if that's the state of the record, how were you harmed by the district court not making an express finding that the two plaintiff's experts were competent under Daubert to testify and render their opinions in their areas of expertise? I understand, Judge Thelman. Geir Dietrich, the expert in question, would have testified that it's standard practice for colleges and universities to have a request-driven process, the same process that Los Angeles Community College District had. She said that she didn't have any issue with their technical conclusions. That's all she said. But she would have testified on a different topic, on the topic of what was standard. So now then, are we left unrefuted? The conclusions of the plaintiff's experts as to why the Community College District is liable for not making their educational materials more accessible in meeting the standards. The experts went into specific points to be articulated in the papers. There was an automated tool that one of the experts used that had to have manual checks. So there were 42 errors found that had to be checked manually. I understand the court's line of questioning. Let me back up a bit. The expert issue diminishes in importance compared to the other issues. I think it's a disparate impact. We've been twisting and turning and asking for additional briefing on whether the theory survives Sandoval. I know that there was claims that there was no policy or practice and therefore it can't withstand that. That's why I was asking, so what is the policy or practice? What I understand the practice to be is you wait until someone complains. Does it have to be a written policy or practice in order to satisfy disparate impact? I don't think it has to be written. Just answering the court's question candidly, it can be a resource, it can be a policy. But I think there's no disparate impact cause of action at all anymore for Title II or for the Rehabilitation Act as Sandoval describes. That resolves this whole case. Did you argue that disparate impact did not survive Sandoval before the district court? Or was that just after we asked you all to argue it? It's implied and I think the court picked it up from our arguments regarding there being a lack of damages for disparate impact. It's encompassed in our argument that there's no facially neutral policy alleged. That's our first argument in the brief. The court actually specifically said this is a disparate impact case. There are three elements of disparate impact. Facially neutral policy, lack of meaningful access, reasonable modification. I guess that either of the parties say that disparate impact does not survive after Sandoval in these type of cases. Did anyone argue that in front of the district court? Or did you even argue it in front of us before we asked you to brief it? Well, you asked us to brief it and it's now submitted. But it sounds like it was a little judicially, this argument was judicially created for everyone. Did anyone give the district court the benefit of that argument? We did in our ten page briefs and the wisdom of the court in taking our arguments and thinking about them more clearly and realizing that this is an opportunity for this court to really clarify this area of the law in a significant way. I think that we do look good from, and I'll explain why the court's point about looking good in this is I'd like to spend 60 seconds on it and then we'll go on to some of the other issues that are really dispositive of this appeal regardless of whether we look good. The district court's position is these two bright line rules mean number one, no request for open process. That means if a student asks for help then there's a disability violation, there's a violation of federal law. So if there's a provision whereby that happens, you violate the law. The problem with a lot of students, once Payan asked for help in his class, the court said, look, he had to ask for help because he couldn't get into my math lab. There's a violation of the ADA, bright line rule. The court did not look at it further. That's the only finding of liability in the jury trial. It went to trial to a jury with deliberate intent. The only thing that was found was that one instance of Mr. Payan not being able to access that one resource. The jury otherwise found no intentional discrimination. A jury found that for the library resources, the website, people saw Mason's experience with their psychology handbook. So what about the plaintiff's or the appellee plaintiff's argument about they were entitled to a jury trial on this? That seems fairly compelling. They could say that if this court were to remand and say this has to go back to the jury, our position would be that their only cause of action Sandoval eliminates a disparate impact cause of action. Their only cause of action is reasonable accommodation. Except after Sandoval, there have been Ninth Circuit cases applying disparate impact to cases like this. So the position that we're in is could we even, let's assume that we agree with you, could we even do that? We've got Miller v. Gammie that says we have to even agree with you without Suess-Fonte calling this case en banc. We're bound by cases in our circuit that have applied disparate impact subsequent to Sandoval. Certainly. Judge Callahan, let me address that point directly. No case creates that precedent. The closest one is Mark H., which says you have to have intent for rehabilitation. That claim supports our position. Crowder was before Sandoval. Enyart did not involve disparate impact. It doesn't use the word disparate impact. It's called Enyart, E-N-Y-A-R-T. I'd like to take 30 seconds. Before you do that, I'd like to get your answer to this question on disparate impact. The problem with your position is that it completely eliminates unintentional discrimination against the disabled, which even the Supreme Court has recognized. A perfect example of that is physical access barriers. It may very well be that when a public building was constructed, nobody gave any thought to accessibility by someone in a wheelchair. But we now know that there are lots of public buildings out there or other places of public accommodation that can't allow people in wheelchairs to access the premises because they don't have ramps. And yet, doesn't the ADA provide them with a cause of action, even though the discrimination is unintentional? Your Honor, there would be a remedy. This doesn't rule out an administrative remedy, but the EEOC or an agency in charge of enforcing it. We've got a lot of cases in the Ninth Circuit that have recognized claims, just those kinds of claims, by individual disabled persons who couldn't get access because the counter was too high for their transaction. Your Honor, there isn't... And if we accept your position that there is no private right of action for disparate impact, then what do we tell those claims? Well, you would tell them that there's an intent requirement, and that's why individuals will send  But Congress has specifically used the phrase benign neglect in its legislative history in enacting the ADA. And isn't that a perfect illustration of benign neglect? A shopkeeper may never have intended to make the counter so high that a person in a wheelchair can't conduct a transaction, but the fact remains there's a physical barrier to access that harms the disabled. That's true, your Honor. But when one has a disability, in this case it's blind students, much of the world, that could also extend far the other way. An intent requirement will limit the recovery to appropriate circumstances, and it is the law. Mark H. talks about an intent requirement. I think that these Ninth Circuit cases are a problem, but I think under Miller v. Gammey, we do. We can't just declare that Sandoval overrules all these cases without a darn good reason to do so. I've given you one major concern of adopting your position in the face of current binding Ninth Circuit authority.  I've only got two minutes left, but I want to take 30 seconds to address the issue of my client's process toward the disabled, and the process of the University of California and other institutions, public institutions of California. What the Court would strike today is the process that's used for those institutions I was describing in the request for judicial notice. If there's an inaccessible material, that creates a problem that the district has to resolve. Under the district court's rules, the two, no request for process prior to or same time, the student would have to go in and simply without having their capabilities ascertained, be handed something that one hopes would be accessible to them, and then it's like a solid barrier. There's no request process. Once they ask for a request and there's a process invoked, that's the disability discrimination. I don't think you make a bad argument that the plaintiffs go too far in that, but the facts of this case aren't that that's just what happened. There were other that, the facts in this case that they did go in, and then the question is what they were given, whether if that was really, was that, did that really put them in any position that they would be entitled to? If you can't do your homework, and if you get the materials much later, and I think it's, I don't think it's out of the question for people to think that if you have a disability, it might take you a little bit longer to do your work, so giving you a delayed access to your work doesn't does not help you in that situation. It hurts you more than the average person, as far as that goes. I don't disagree with you that it could just be like, well, come in, and I get it in 15 seconds, or there's a violation. But on the other hand, I don't know how many blind people do you usually have a year? There are a good number. I would say less than 100, more than 40. Well, so wouldn't it make sense that that prayer that no blind person comes in and asks for anything isn't a good policy or practice? I mean, wouldn't there be certain things that you could have available, or wouldn't there be certain software that you could purchase to do their homework on? Or it seems like with, that's what you're getting the money for, isn't it? That's what you get the position for, to be a little bit proactive about it. Your Honor, that's an important point, and the, I'm running out of time, but one critical... Well, we're asking you questions, so I'll give you a little  The problem for that is that blind students, and we're looking only at blind students, their capabilities differ. Some read Braille, some don't. Some use JAWS, the speech reading software. That's not even just in the classroom. It's the website. The school's website wasn't accessible. Presumably that, you know, you can assume that blind people cannot read the school's website. That could have been done very proactively to make that website accessible, and it appears the school didn't even do that. There's no individualized inquiry in a particular class that's a material to the school website. Our position would be that, or our position is that it was readable in JAWS. The experts found issues with it, and the plaintiffs said they found issues with it. I don't think anything was inaccessible with screen reading software. It's a question of getting it up to speed. WCAG, WCAG 2.0, those standards, WCAG 2.1 AAA, there are still issues. There would still be problems. It's a spectrum. You can't make anything perfect. What did the county have available if a blind student presented him or herself? What did they have in place that would be available right then to say I'm blind, I need help? What was available? OSS and the high tech center. There's an entire portion of the city college that's I need this text right away, which is what Mr. Payan did in his math class. They started converting the homework assignments for him. The allegation was they just didn't do it fast enough, and he fell behind in class, but he didn't pass the class. I guess they say it's a floor, not a ceiling or something. If I get a C-, but I could have gotten an A if I'd had things, is that you're saying, well, you passed. Good enough. Well, they have to have meaningful access. You can't tell whether that was attributable to his having those materials. You can't establish causation. I see the court's point. Anyone that's taken math and has fallen behind knows that one lesson builds on the other, and it doesn't go well when you get behind in a math class. That's certainly true. The problem with that particular class, and by the way, this is the only finding on which the jury found consent. That's it, was Mr. Payan's experience in his math class. Of all of these students that would be coming here, they would probably be taking certain general ed classes. What sort of preparation did you have for those classes to help people right away? There was vocational training in OSS. There were other types of support. If he said, I would like these converted to Braille, I don't have screen reading software, that would have been their job to do that. If they didn't do it well enough, they would be subject to a reasonable accommodation claim. That's something that they have to deal with that is binding on the district. Just to go back, anyone who does have a disability, anybody who goes to college, disability or not, they want to be able to call in and get help. The way all these schools deal with that is they have resources available. They can try to make something available to a student, a textbook right away, but they might not get it right. They could offer them a Braille textbook. I thought the record also showed that there was no proactive effort by the district to test new educational materials that professors wanted to use in their classes to determine whether or not they would pose an accessibility problem for the disabled. Isn't that what the record showed? For the library, the record did show that the process of testing for accessibility was request slash complaint driven. That's part of what led to discrimination as to that. Wasn't that one of the responsibilities for this unfilled czar of disability access? I can't remember the title. The office I asked you about earlier. That wasn't a part of the finding of liability. The court's injunction does require a dean of educational technology. I was looking at the position description for the job. Wasn't that one of the jobs that was assigned to that office? I see why the court would focus on that since it is not something that led to it might have been relevant to the jury trial, but we're not attacking those as directly as the prior findings of liability. What was some of the money that you get for that position? I'm sure that the district does get money for having blind students. The court's injunction the cost would be enormous, well beyond any money that the district would get. Except for, I'm pretty sure that you can't say something costs too much if it's required by the law because what happens then is they take all your money. When you say something costs too much and that's why we don't do it, if it's required by the law, that's a no-no. Certainly, but the disability law says that a fundamental alteration or undue burden is unnecessary. The injunction also says that. Our position or key point is that those two bright line rules that the court adopted are not supported by the law. We directly said it in our opinion. We looked on Westlaw, there's no injunction like this. Let's just say we agree with you that part of the injunction is too broad and we said that it's not supported by the evidence and so we choose to strike that part of it. My understanding of the way the cross-appeal, and I will ask the other side, the way they have brought it is they say if you change one thing, then we want everything in our cross-appeal and we want to blow this whole thing up and we want our jury trial. I think that's my understanding of their cross-appeal. If they don't get a straight across-affirmed, even if we just cross out a couple of words, they're saying give us our jury trial. Well, give us our jury trial and there's no injunction. I think that's what the bill is saying. The injunction will be gone. I know, but they can say it. I'm just looking at it from a legal perspective. Put yourself in our position when you have what would look like sort of a prophylactic cross-appeal. My reading of it, if I read it correctly, is they're saying if you don't affirm across the board, then look at our cross-appeal and decide our cross-appeal and it looks to me like they would be entitled to a jury trial and so then I have to give them the jury trial and even though I might X out certain things on the injunction, but that still would blow the whole thing up and then we have to start, we're back to square one. I think that would be something for the court's careful deliberation but I think that if there were a significant change to the injunction, the injunction would be gone. We would go back for a jury trial. That would be, if the injunction is significantly changed. Well, think about, I'm going to come back and give you some rebuttal time, but think about it after we've talked to you and after you listen when we talk to the other side and I'm going to ask them about it too. I noticed this there was no real mediation in this case because obviously maybe both sides thought that they were going to walk away and win here. I think everyone spent quite a bit of money and if it's reversed and it starts over again that's quite a bit of money, which I'm sure that the attorney's fees alone, if you don't prevail, you have to pay their attorney's That's right. And your attorney's fees are attorney's fees that we're spending on that don't go to other students, right? It could be something that could be mediated, certainly. Well, just think about, I know that it probably didn't appeal to anyone before but after you've endured our questions for a period of time and will come back, your able counsel on the other side will endure probably similar questions and then maybe, I'm just curious if anyone's had a different view on that. I'd like to reserve four to five minutes for rebuttal. Well, you're nine minutes over right now, so you don't have any rebuttal, but I will give you probably three minutes of rebuttal. Thank you. Are you ready? Are you anxiously ready to see what's coming your way? Yes, your honor, I'm more used to being the appellant, so sitting here waiting is torturous. May I please the court, my name is Zaharia Chavez here on behalf of the plaintiff's appellees and cross-appellants, conditional cross-appellants, Lori Payne, Portia Mason, the National Federation of the Blind, and the National Federation of the Blind of California. I'd like to make three points today. First, despite what LACCD has said throughout its briefing, this is not a disparate impact case. We did not plead or pursue our claims on a disparate impact theory. We brought claims for disparate treatment, and based on LACCD's failure to affirmatively provide equal access and make reasonable accommodations to its practices to prevent discrimination against blind students. Counsel, I have a hard time accepting that representation when one of the courts, I think it's paragraph two of the injunction, addresses the whole question of accessibility of the library's entire database and then orders any database that cannot be made contemporaneously accessible to disabled students cannot even be used for accessibility. And that seems to me to be based on a theory of disparate impact, not necessarily on whether your two individual clients could access all of the databases of the library. Your Honor, I agree. It's not about our two individual plaintiffs, and this case has never been about only them. We have organizational plaintiffs. It's about the experience of blind students at this college. But our claim about the LACCD's failure to reasonably modify practices. Now, often it's policies and practices. But in this case, LACCD actually has very good policies on the books about accessibility of software, about purchasing software, about the technology it uses in class for student access. The problem is they don't implement those policies. As you have identified with Mr. Urban, they don't have practices to ensure that the library is accessible. Let me ask you this. This goes back to what Judge Tallman was saying. If we were to vacate Paragraph 2 of the injunction, dealing with the library databases, and otherwise deny relief requested in the district's appeal, would this case still need to be remanded and retried in front of a jury on the basis of your cross-appeal? No, Your Honor. I don't think it would need to be retried because our cross-appeal... Your cross-appeal basically says, don't touch anything. And if you touch anything and I think Judge Tallman's saying, and I can't speak for him and we haven't talked about this case. But I'm telling you, I have a problem with Paragraph 2. And I think that's over broad. And so, I would have to probably say something about that. I don't know how my colleagues feel. And my question is, if I thought everything else was fine, except for that, it seems like it's got to be retried based on your cross-appeal. Your Honor, I think if the court wanted a modification of a small part of the injunction, it would not require a complete reversal of the case to start from the beginning. That's not a small part of the injunction, Counsel. It deals with the entire database of the library. And I assume that's a pretty significant amount of information. I think that's what Mr. Urban was getting to when he talked about the fundamental impact on the district if the injunction is fully complied with. Isn't that what we're arguing about here? Well, Your Honor, I think we don't know exactly how big it is or how big the accessibility problems are. Well, let's just take the sentence that says, within one year of the date of this order, the district shall evaluate the City College's integrated library system website and all library databases available to students enrolled at the college to determine whether the library resources are fully accessible to blind students. The district shall either discontinue the use of any inaccessible library databases, which means that nobody gets to access them, inaccessible documents contained in library databases, or other inaccessible library resources available to students enrolled at the college, or establish alternative means of providing access to the equivalent benefits of the inaccessible library resources to blind students in a timely manner, i.e. prior to or at the same time cited students are provided access to those library resources, including outside of the classroom. Boy, that's a big ass. Your Honor, I apologize. Exclamation point. End of question. I think there's a two-part response to your concern about that. Number one is, getting back to what Judge Callahan focused on earlier, this sort of survey of the databases should have been done already under LACCD's affirmative obligation under these statutes to understand what is accessible and what isn't. But the district court goes further. The district court wants to shut off access altogether to a database that cannot provide contemporaneous access by disabled persons prior to or at the same time. It does give a choice, your Honor, and I think this is part of why this injunction is not so onerous. It gives LACCD a good amount of distance because it says LACCD has tried alternate means of timely access for blind students or an alternative means of access. It doesn't say shutting it off is the only way to do it. There has been no discussion at any point in this case, nor has there ever been evidence that LACCD has tried alternate means of timely access for blind students. So what support was in the record to support the district court's paragraph 2 in the injunction? What I think the evidence in the record is that thus far, there hasn't been timely equivalent access for blind students. But I don't think that means that the only answer is to not consider the second part of the last sentence of that paragraph 2 of the injunction or equivalent, I'm not reading it, or establish alternative means of providing access to the equivalent benefits. So the only option isn't to turn it off. That wasn't my question. My question was one of evidence. Correct me if I misheard your answer, but I heard your answer to be the only evidence that supports it is that the district didn't conduct a study to determine when materials were accessible. The other evidence is that the individual plaintiffs both experienced accessibility barriers when using databases in the library and weren't highly able to access what they needed to. But you want to every database they have a problem with and no one else can use it, too. I mean, you might as well just add in world peace here. And then that will just round out this injunction and you must achieve world peace. It's very, you know, I just have to speak for myself and I'm only for myself, but it's very broad. And I question the support in the record of evidence. I understand your concern. I think this paragraph of the injunction is based on the requirements under the law for equal access to the benefits and programs, meaningful access, and equally effective communication. But it gives LACCD the discretion to find other means of providing that meaningful access. They have never at any point in this case argued or put on evidence as to fundamental alteration nor did they even plead unburdened or cost as a defense. And so there's no evidence in the record as to what this would entail outside of perhaps some evidence, if it can be called that, in the motion for judicial notice where I would argue it's an inappropriate motion seeking to introduce evidence before this court that was never put before the district court as to what this would entail. And so while I understand that it seems very broad, I also think we're talking about a world of hypotheticals because LACCD has never provided evidence of how broad it is or how onerous it would be or what it would entail. But the injunction also has a provision in paragraph 6 that if it is an undue burden or fundamental alteration, LACCD can bring that to the court. Rather than take advantage of that, they have brought all of this to you without a proper record. Why doesn't that provision that says if blind students cannot or disabled students cannot equal to or before access by a non-disabled student, then everybody has to be forbidden from using that particular database. Can't we say as a matter of law that that fundamentally alters the nature of the service program or activity as 28 CFR section 35.130, and I don't know what subsection it is because it goes on for pages, but you know what I'm talking about. Yes, Your Honor. I think we could say that if there weren't that subsection B in paragraph 2 allowing for alternative means of providing access. So if the only option were for LACCD to shut down the library databases, I think there would be an argument it's a fundamental alteration. But again, I think that argument needs to be made before the district court pursuant to paragraph 6 of the injunction which LACCD has never done with evidence to support it so that there is a complete understanding of what it would take. Did your experts offer any suggestions as to what alternatives might be available for these databases? I don't believe they offered specific suggestions. Some databases, it's the interface itself that is inaccessible, and so that usually is a technological fix. Some of them, it's that the articles within them are inaccessible. That usually entails having a way to make that electronic article accessible. There was some testimony about a specific kind of scanner called the Kurzweil that I believe the library does have. It's just a matter of having someone available to use it and assist the blind student. We're all familiar with PDFs and ways that you can OCR them, and that usually with some additional checking makes something accessible to a screen reader. So there are alternate means. I hesitate to stray too far from within the record, but I think that LACCD does have an opportunity to be creative and think about if it's too much to shut down the databases, which I think we would understand, of course, then is there a way to have someone available the way other students have constant access so that if a blind student needs something there's someone they can call to assist them at that time. I don't think that would be a fundamental alteration or an undue burden considering the vastness of LACCD's structure and its resources. There hasn't been evidence on that because LACCD's never pursued those defenses or brought this to the district court. I guess one of the things that concerns me about this entire case is by virtue of the way that procedurally of the way that it developed the district court ended up doing some things that should have been delegated to the jury under the 7th amendment in determining liability. Then it issued what I will call a blunderbuss injunction and I think paragraph 2 is probably the worst offender in the injunction and you're telling me that there wasn't really much evidence offered by the defense to show that this would constitute a fundamental alteration, but it doesn't sound like there's an awful lot of evidence to justify the requirement in the first place simply because there may have been one or more databases that your clients had trouble accessing. The district court sort of teed off that particular point and then came up with this very broad requirement that as I read it threatens to shut down a part of the library which strikes me as just being wrong. That can't be what the law requires. This thing is just a mess and I don't even know where to begin in trying to unravel the mess that this case presents. Your Honor, we would agree that this case was not an easy one from start to finish and it did get convoluted at times. However, I think ultimately the court applied. I would like to add more than that. He said mess, I would say hot mess. Thank you, Your Honor. I will let your words speak for how you would like to describe it. I do think at the end of the day that the judge applied the correct standard under Ninth Circuit law which is meaningful access and Judge Tallman, I understand your concern, but this injunction is born in part out of the case the defense put on or failed to put on. Plaintiffs testified about their library. The librarian admitted that she knew there were some accessibility problems. There was testimony that no one had ever done an accessibility check of the library databases. Ryan Kushner who works at OSF but is not an expert, whose job is not to test software, he knew that some of the databases had problems because they heard from blind students before. He knew some of them were inaccessible and yet there was still a system where a student when they had a problem had to go tell them there was a problem and try to get an individual accommodation. I was asking Mr. Urban, what would you say, how would you describe their policy? What has to happen before they need to respond? What is the policy? There's not a written policy, correct? There are a few different policies that do cover this area. There's the alternative media production policy that's at ER 1207 to 1211. The district has a regulation B33 which is at plaintiff supplemental excerpts at 434. Both of those, the alternative media production policy is about what to do about physical materials like handouts that you might get in class or textbooks. There's a policy on that and how to have them readily accessible. The district regulation B33 is about the accessibility of technology. Judge Tallman identified the Dean of Educational Technology position that was left unfilled but would, as the injunction requires, assist in ensuring that they follow their own procurement policies about being aware of accessibility, making sure things are accessible. Those are the policies. What is the practice? The evidence shows that the practice is, as your honors have described and identified, a sort of ad hoc one-off. Somebody comes and says, I have a problem and they expect OSS to deal with it. OSS can't fix an inaccessible website. They can't fix an inaccessible student information system. There's no way to fix those for one student. LACCD has claimed throughout this case that these are just issues of reasonable accommodation but there are no individual accommodations that will remedy the majority of the barriers faced by Mr. Payan and Ms. Mason and other blind students at LACCD. They could go to OSS every day in the semester and the website is unlikely to be accessible by the end of the semester. There's just no way to have timely, meaningful access with that kind of practice. Counsel, let me suggest something to you. I'm keying off a suggestion that Judge Callahan made earlier. From my perspective as the appellate judge here, we could try and figure out, if we're going to send this case back to the district court, how to instruct the district court as to where it erred and how it needs to proceed which may very well require a do-over pretty much of the entire case. At the end of the day, we might end up with a much better injunction than what we have before us. But an alternative to that would be for the two of you to sit down with a mediator and fashion relief here that will address the concerns that you have articulated, which I agree seems to be embodied in the policies that are written but we might need to include some provisions of meaningful enforcement if the district doesn't in the future comply with the policies in the way that you would like to see. And it just strikes me that this is the kind of a case that resolution would be better if it were hammered out by the parties than if a judge tried to fashion it and tell you what's going to work. Would your client be willing to sit down with the court's mediators and see if you guys can work out an acceptable resolution? Your Honor, I hesitate to give you a firm answer one way or the other without speaking to my client, but based on the past proceedings in this case and the fact that at least one mediation did take place in the past, I believe that we are always willing to seek solutions. This case was You didn't do any meaningful mediation in the past, right? You were contacted and you talked to the mediator for an hour or something, right? We had one private mediation, Your Honor. Not the court mediators? Not the court mediators. Okay. How much have your attorney's fees been so far? Your Honor, I apologize. I didn't check what they were prior to... Give us a ballpark. I would guess having gone through three motions for summary judgment and trial in this case, probably close to a million dollars, but I'm not positive. Mr. Urban, how about your fees? What are the defense costs so far? You need to unmute. Sorry, Your Honor. We were not district court counsel. Our fees are way under a million, more than a couple hundred thousand. That's just appellate costs, right? We've had some work in the district court, too. Okay, but trial counsel probably would have in excess of half a million, probably closer to a million. I'll give ballparks. I don't want to divulge confidential or privileged information. I don't think that information is public. I think you've answered it enough. We've got somewhere between two and three million in fees alone on this case. What we're suggesting here is going to be a lot less expensive than doing a do-over of the case. You're going to just be back in front of us again because either side or both of you are going to be unhappy with the result. I'm offering you a quick and less expensive way to hammer out what I think might actually be a better solution than what the courts could fashion for you. If I can interject quickly, our firm has had great experience with federally appointed mediators. Part of your court who's helped us mediate cases. It's been a great success. I just mediated a case that had been through private and a state court retired judicial officer mediation and the third time around we settled it. I think this one to me cries out for another effort at mediation. I guess what I would say too is both of you are in a different place than you were when you mediated the case. You both have had an opportunity to see how your case plays out. You've had an opportunity to hear from a jury. You've had an opportunity to hear from the district court and you've had some musings of an appellate panel. If it didn't settle in mediation, then we decide the case. That's what we're here for. That could also mean that then it goes back and then you both each spend a million more. At the end of that, if plaintiffs win, you get your fees, right? Yes, Your Honor. Then they pay Mr. Urban too. I guess all of that money comes that doesn't help any students, right? Yes, Your Honor. I think it's clear from the case plaintiffs brought that this case was never really about individual damages. It's about improving the experience of blind students at Los Angeles Community College and LACC. That's our ultimate goal. Just quickly, the overbroad injunction is not going to help blind students and certainly not going to help other students either. That's our position. I haven't had a chance to confer with my colleague, but we're not insensitive to the cost of compliance with the injunction that's currently framed. As you can tell from our questions of your opposing counsel, we're concerned here that the district court fashioned an injunction that's kind of a blunder bus based on the state of the record. That is of grave concern to me because I think it's going to be very expensive for the district to comply with it as it's currently written. Your Honor, if I may, I would just point out that outside of the provision we've talked about at length about the library databases, I would say that most of the injunction is pretty narrowly tailored to the evidence at trial. I don't want the entire injunction to be considered a blunder. Of course you don't, but appellate judges are not magicians and don't get to cherry pick. We apply the law and if we reverse something, we reverse it and that's the way it goes. I think part of my point in just wanting, I think both of you have some vulnerabilities not in terms of, and both of you have had some experience with the courts, that I would just, we decide cases all the time and we have to follow the law and a lot of times there are mechanisms that both of you have arrows in your quiver that we don't have. I would have to say that you've heard things, Judge Lee and Judge Tallman and I are not social workers. We would like to think that we're legal experts and we may not get agreement from all the people that we've ruled against throughout the years, but that being said, we have legal confines. We've taken you over as well, but are there, whatever else you would like to say, I'm going to give Mr. Urban another, I mean this has been unusual in the sense that we've allowed both of you to speak a little bit out of turn here, which we don't generally allow that and we thank both of you for that because I think, but what would you like to add before we conclude your comments? Thank you, Your Honor. All I would add is I think the court has really identified the barriers to access that blind students at LACCD or Los Angeles Community College face, they continue to face, and none of us would have accepted an education like that and they shouldn't have to either. Thank you. Thank you. Mr. Urban? I hope to use less than three minutes. First of all, for the mediation, an order on mediation, I think I'd have to come forward with my client about if an order would be something we would comply with and we've had success with that in the past. What we would do, if we decided that that's what we were going to do, is we would vacate the submission. We would order it to mediation. If mediation doesn't work out, it comes back to the panel. We've had oral argument and then we decide the case on the legal issues that are before us and we'll conference after this and make our decisions. Understood, Your Honor. Some quick points back to the advocacy phase. The plaintiffs have said it's a meaningful access case and it's tried on that basis. The trial court said this is a disparate impact case. ER 6869, ER 7374, those four pages, the court says no more reasonable accommodation. This is a disparate impact case. Here are the elements. Our position would be that we would ultimately be entitled to judgment in our favor for these reasons. First, the court said there are two types according to the court of claims, reasonable accommodation, and disparate impact. The court said that the plaintiffs have abandoned reasonable accommodation. They proceeded on disparate impact, a cause of action that does not exist. Because they abandoned reasonable accommodation, it's adjudicated and done. The cause of action that doesn't exist is adjudicated and done. It's not an error by anyone to do that. In order for you to prevail on that, we would also have to find that Sandoval overrules any Ninth Circuit precedent that says you can have disparate impact cases, right? There is no Ninth Circuit precedent after Sandoval that says that. The case that comes closest to addressing it is Mark H. which says there is an intent requirement. This court is free to follow the Sixth Circuit in jail if it sees fit. There is no case after Crowder that talks about it. Crowder is 1999. For the jury trial point, that's a very significant one. We've argued in our papers that the jury trial is appropriate because the damages are incidental. You might wonder, $40,000 doesn't compare to many millions with respect to the injunction. That's incidental for that reason. Plaintiffs could come back and say they wanted hundreds of thousands at the outset. If you go to the actual complaint, the complaint says we want a rehaul of everything at the entire district. So even $100,000 emotional distress is incidental to the vast injunction they originally sought. We would uphold the jury trial for that reason. The court correctly identified the findings on the library database as inadequate. When asked about reasonable modification, the district court said plaintiffs presented no evidence of the third element of disparate impact as this court sought. The court said it's self-evident that reasonable modification means deleting everything that is inaccessible, etc. The court phrased it in a way that was persuasive but didn't have the backing of any evidence. There's a total failure of proof on that claim. Last point, I'd like to refer the court for the two bright-line rules. Our perspective is those really decide the case. There's no basis for those two rules, the per se rules prior to or same time, and no request-driven process. The California State amicus brief addresses that very thoroughly and well. We'd refer the court to that as an addition. That's all I have. Thank you both for your arguments in this case. This matter will stand submitted. This court will be in recess for the week. If judges, you stay on, we'll go to the robing room. Thank you. Have a good weekend, everyone. This court for this session stands adjourned.
judges: Tallman, Callahan, Lee